UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DANNY R. RICHARDS,<br><br>Plaintiff,<br><br>v.<br><br>INDIANA DEPARTMENT OF CORRECTION, et al.<br><br>Defendants. | CAUSE NO. 3:25-CV-517-GSL-JEM |

OPINION AND ORDER

Danny R. Richards, a prisoner without a lawyer, filed a motion seeking reconsideration of several aspects of this court's screening order. ECF 16-1. He also seeks a preliminary injunction, and that motion has not yet been fully adjudicated. ECF 10; ECF 41. Finally, Richards seeks reconsideration of a portion of this court's March 13, 2026, order. ECF 42.

Reconsideration of the Court's Screening Order

District judges have the discretionary authority to reconsider interlocutory orders any time before final judgment. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). "The authority of a district judge to reconsider a previous ruling in the same litigation . . . is governed by the doctrine of the law of the case, which authorizes such reconsideration if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck*

*& Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006) (citations omitted). Reconsideration of an interlocutory order "serve[s] a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Res., Inc. v. Walker–Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (citation omitted). It should be noted that these types of interlocutory motions are generally discouraged because:

> a district court's rulings are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure, and ill-founded requests for reconsideration of matters previously decided needlessly take the court's attention from current matters and visit inequity upon opponents who, prevailing in an earlier proceeding, must nevertheless defend their position again and again.

*Cima v. Wellpoint Health Networks, Inc.*, 250 F.R.D. 374, 386 (S.D. Ill. 2008) (cleaned up).

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

This court's screening order summarized the factual allegations of Richards' complaint as follows:

> According to the complaint, Richards was diagnosed with Clostridioides difficile ("C. diff") in August 2008. In February 2009, he underwent a total colectomy. In September 2009, he had another surgery, which removed 98% of his rectum and a portion of his large intestine. This led to the creation of a "J pouch." ECF 1 at 5. A J pouch is "a pouch inside the body that allows a person to get rid of stool in the usual way." https://www.mayoclinic.org/tests-procedures/j-pouch-surgery/about/pac-20385069 (last visited Sept. 30, 2025). In February

2010, Richards underwent another surgery where the J pouch was connected to what remained of his rectum. Richards submitted exhibits with his complaint indicating that he had C. diff again in 2019. He believes he has an active C. diff infection yet again, although Dr. Marthakis has indicated otherwise. Whatever the cause, Richards reports that he is suffering from chronic diarrhea, urinary incontinence, incomplete emptying with frequent urination and bowel movements, and leakage from his bladder and J pouch.

> Richards is housed in protective custody and, in the cell house, the only restroom available to him is inside his cell. The Indiana Department of Correction ("IDOC"), Assistant Warden Dawn Buss, Assistant Warden Mr. Nowatzke, Unit Team Manager J. Schneider, Maj. Worlord, Sgt. Robinson, and Sgt. Schmitt have allegedly issued an administrative directive or post order that cell doors remain locked during the three hours of recreation allowed for inmates in Richards' housing area.
>
> The first hour of recreation takes place on the roof. There is not a restroom on the roof, so Richards does not participate in the first hour of recreation and does not get to enjoy fresh air and sunshine. The next two hours of recreation take place inside the cell house's dayroom. Because his cell door is locked, he does not have immediate access to a restroom. This has caused Richards to urinate and defecate on himself several times. When this occurs, he has been forced to wait up to twenty or thirty minutes to gain access to his cell and clean up. Therefore, he no longer participates in the second or third hour of recreation.
>
> He claims that the Indiana Department of Correction ("IDOC"), Assistant Warden Dawn Buss, Assistant Warden Mr. Nowatzke, UTM Schneider, Maj. Worlord, Sgt. Robinson, and Sgt. Schmitt knows that he suffers from chronic diarrhea, urinary incontinence, and severe pain, but they have disregarded his need for accommodations to enjoy recreation; namely, access to a restroom without delay. Richards reports that the defendants claim the doors are kept closed due to safety and security concerns. However, the unit has eleven inmate sanitation workers, and they are each allowed to keep their cell doors open from 6 a.m. to 6 p.m., including during recreation. The IDOC and other named defendants will not make an exception for Richards. They will only allow him to request permission to have his cell door opened so he can use the restroom. But, when he requests that his cell door be opened, he has been yelled at or told that the doors will open at the top of the hour, consistent with policy. Dr. Nancy Marthakis allegedly informed Assistant Warden Buss, UTM Schneider, Sgt. Robinson, and Sgt. Schmitt that Richards does not suffer from any disability or impairment, his C. diff resolved in 2021, and he only has a chronic illness code, not a disability code. Richards asserts that Dr. Marthakis' refusal to categorize him as suffering from a disability has resulted in a refusal to accommodate his medical needs by the IDOC and other individual defendants. Richards contends that his C. diff should be treated as a physical impairment that is episodic or in remission. He asserts that he is being denied access to a program or activity, including recreation and a restroom.

ECF 14 at 2-4.

Richards was granted leave to proceed on the following claims:

- against the IDOC for monetary damages for failing to accommodate Richards' disability by providing him with prompt access to a restroom so he can enjoy the benefits of recreation, in violation of the ADA and the Rehabilitation Act;
- against the IDOC for injunctive relief to accommodate his disability by providing prompt access to a restroom so he can enjoy the benefits of recreation, to the extent required by the ADA and the Rehabilitation Act; and
- against the Warden of the Indiana State Prison in his official capacity for injunctive relief to receive constitutionally adequate medical care for his severe diarrhea and pain, in violation of the Eighth Amendment.

*Id.* at 16.

Richards takes issue with the court's determination that he did not state an Eighth Amendment claim against Dr. Marthakis for providing him with constitutionally inadequate medical care. He also takes issue with the court's determination that he did not state a claim against Assistant Warden Dawn Buss, Assistant Warden Mr. Nowatzke, UTM Schneider, Maj. Worlord, Sgt. Robinson, and Sgt. Schmitt for failing to provide him with both constitutionally adequate medical care and constitutionally adequate conditions of confinement.

*Richards' Eighth Amendment Allegations of Inadequate Medical Care*

As explained in this court's screening order, the legal standard governing Richards' Eighth Amendment claims of constitutionally inadequate medical care is as follows:

> Inmates are entitled to constitutionally adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring

'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-98. Put another way, inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Accordingly, deference must be given "to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). This standard "reflects the reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). Additionally, it is not enough that a medical professional be mistaken in his or her judgment. As noted above, the deliberate indifference standard requires something "akin to criminal recklessness," *Thomas*, 2 F.4th at 722, rather than "negligence, gross negligence, or even recklessness." *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Ignoring an inmate's complaints of pain or delaying necessary treatment can amount to deliberate indifference, particularly where the delay "exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations and internal quotation marks omitted).

ECF 14 at 6-8.

*Richards' Allegations Against Dr. Marthakis*

This court's screening order analyzed Richards' allegations against Dr. Marthakis as follows:

> Richards has a history of C. diff, in 2008 and again sometime around 2021. He does not provide details regarding when exactly he had C. diff. Based on his symptoms, including frequent diarrhea, Richards believes he is suffering from a recurrence of C. diff. C. diff can recur, and at least one study shows that, after one recurrence, the risk of future recurrence increases. https://wwwnc.cdc.gov/eid/article/29/5/22-1294_article (last visited Sept. 30, 2025). Richards also notes that Individuals with a J pouch can suffer from other serious infections, such as pouchitis.[1] He believes that Dr. Marthakis should test him regularly for C. diff or send him to a gastrointestinal specialist who can perform a colonscopy or pouchoscopy to check on his J pouch.
>
> When Richards tries to discuss his concerns with Dr. Marthakis, she becomes upset. Richards feels that Dr. Marthakis is belittling; she tells him he does not know what he is talking about and emphasizes that she is the doctor. For example, Dr. Marthakis told Richards that he does not continue to suffer from C. diff, but when Richards asked Dr. Marthakis how she knows he does not have C. diff, she pointed to her diploma and said, "Do you see that document on my wall[?] [I]t says Doctor. Do you have one Mr. Richards?" She then ended the meeting.
>
> Richards' complaint demonstrates that Dr. Marthakis' bedside manner is lacking. Common decency requires that a treating physician answer her patient's questions about his medical condition with respect, but that is not a matter of constitutional concern. This court must focus on Richards' medical conditions and the care he did or did not receive. It is unclear from the complaint when Richards saw Dr. Marthakis, what information he provided her about his symptoms, what tests were performed, or what treatments were offered. Without additional details, the court cannot conclude that Dr. Marthakis' decision to forego a test for C. diff and a referral to a specialist amount to deliberate indifference. However, given Richards' medical history, the symptoms he describes are concerning. Therefore, the court will direct the clerk to add the Warden of the Indiana State Prison in his official capacity as a defendant and will permit Richards to proceed on a claim for injunctive relief against the Warden to obtain constitutionally adequate care for his symptoms of diarrhea, urinary incontinence, and pain. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) ("[T]he warden . . . is a proper defendant [for] injunctive relief [and is] responsible for ensuring that any injunctive relief is carried out.").

ECF 14 at 8-10.

---

[1] Pouchitis is "inflammation… in the lining of a pouch made during surgery to remove the colon." https://www.mayoclinic.org/diseases-conditions/pouchitis/symptoms-causes/syc-20361991 (last visited Sept. 2, 2026).

In his motion to reconsider, Richards speculates that Dr. Marthakis' does not order that testing be done because she does not want to know what is actually going on with him. He argues that Dr. Marthakis' failure to run tests that he believes are necessary, paired with her unprofessional comments, shows deliberate indifference. He states that she fails to document his complaints of pain, but Richards' complaint does not include this allegation. He further states that Dr. Marthakis both fails to provide access to specialists and fails to educate herself on his health conditions, but again this allegation is not included in Richards' complaint.

Richards does not point to an error of law or fact, and he does not point to newly discovered evidence. Instead, he is adding allegations that were known but not included in his complaint. This court's determination of whether he has stated a claim against Dr. Marthakis must be based on the allegations in the complaint, and his complaint cannot be amended in piecemeal fashion by incorporating details he includes in his motion seeking reconsideration. *See* N.D. Ind. L.R. 15-1. However, even if these additional facts had been included, it would not have changed the outcome. Richards still has not alleged details regarding when he saw Dr. Marthakis, what information he provided about his symptoms, what tests were performed, or what treatments were offered. Thus, the court cannot find that Richards has alleged facts that permit a plausible inference that Dr. Marthakis' decisions to forego a test for C. diff or referral to a specialist amount to deliberate indifference.

*Richards' Allegations Against Assistant Warden Buss, Assistant Warden Nowatzke, UTM Schneider, Maj. Worlord, Sgt. Robinson, and Sgt. Schmitt*

Richards also takes issue with this court's conclusion that his complaint did not state an Eighth Amendment medical claim against Assistant Warden Buss, Assistant Warden Nowatzke, UTM Schneider, Maj. Worlord, Sgt. Robinson, and Sgt. Schmitt. In this court's screening order, the court noted that Richards contends that each defendant knows he suffers from chronic diarrhea, urinary incontinence, and severe pain. ECF 14 at 10. The court also noted that Richards believed these defendants should insist Dr. Marthakis did her job, which Richards equates with ordering that he receive further testing, and their failure to do that amounted to deliberate indifference. The court concluded that, as non-medical staff, they may rely on medical experts to provide good medical care. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). No medical provider had determined that Richards required additional testing for his conditions, and these defendants are not doctors. Thus, the court concluded that it could not be plausibly inferred from the facts alleged in the complaint that any of these non-medical defendants were deliberately indifference to Richards' medical needs when they failed to insist that Dr. Marthakis do more for Richards.

In his motion for reconsideration, Richards frames his Eighth Amendment medical claim in terms of being deprived of adequate access to the restroom. More specifically, Richards faults the defendants for signing off on the policy that took effect in June 2024, which limited his ability to access the restroom during indoor recreation. His theory is that these defendants knew of his need to use the restroom frequently and

with little notice, so they had an obligation to provide him with more access than the policy otherwise provided.

The court has already explained the high hurdle posed by the deliberate indifference standard: it is "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Stockton*, 44 F.4th at 615 (quoting *Donald*, 982 F.3d at 458. Enacting the policy Richards complains of does not permit a plausible inference that these defendants acted with deliberate disregard for Richards' needs. Richards has not pointed to any manifest error of law or fact that warrants reconsidering this conclusion.

*Richards' Allegations of Unconstitutional Conditions of Confinement*

Richards' final argument in his motion to reconsider is that the court erred in finding that he did not state a claim against each individual defendant for subjecting him to unconstitutional conditions of confinement. The legal standard was explained in the court's screening order.

> The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" that the action or inaction of a prison official leads to "the denial of the minimal civilized measure of life's necessities." *Id*. (citations omitted). Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), inmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). On the subjective prong, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotation marks omitted); *see also Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (where inmate complained about severe deprivations but was ignored, he established a "prototypical case of deliberate indifference.").

ECF 14 at 12-13.

In his complaint, Richards alleged that his conditions of confinement were inadequate because he has been forced to forego recreation. The court analyzed his allegations and found that these allegations did not state an Eighth Amendment conditions of confinement claim. Richards did not allege that any other condition of confinement was constitutionally inadequate. Now he alleges that, on the occasions when he went to recreation and had an accident due to lack of immediate access to restroom facilities, he was forced to wait to access his cell while soiled. Richards does not, however, allege in his complaint that any specific defendant ever knew he had soiled himself and refused to allow him an opportunity to access restroom facilities to clean up. His motion for reconsideration likewise lacks these details.

Supervisors can be liable if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012), Richards, however, has not alleged that the named defendants were aware of any specific instance where he was required to wait to access a restroom after soiling himself. It cannot be plausibly inferred from the allegations in the complaint that the defendants knew, facilitated, approved,

condoned, or turned a blind eye to instances where Richards soiled himself at recreation due to lack of restroom access *and* guards were refusing to allow him to clean up.

Richards also argues that, given his medical condition, the policy placing limitations on accessing the bathroom create an unconstitutional condition of confinement for him. Richards points to an unpublished case, *White v. Knight*, 710 F. App'x 260, 262 (7th Cir. 2018), where the court found that limiting an inmate's access to restrooms to once every two hours while on lockdown did not state an Eighth Amendment conditions on confinement claim but acknowledged that an inmate with a known medical issue *might* require an exception to that policy. But *White* did not actually reach that decision, and so it is of little help here. *White*, 710 F. App'x at 262 ("We can leave to one side the question whether *Farmer* would require a different analysis for a prisoner who alleges that his particular need for an exemption from a general bathroom policy arises from a medical condition that is known to the defendants at the relevant time.").

Richards also points to *Hawkins v. Knight*, No. 1:22-CV-01434-JMS-MKK, 2024 WL 2763210, at *3 (S.D. Ind. May 30, 2024). In *Hawkins*, inmates on lockdown were given an opportunity to use the restroom every two hours, and inmates who needed to use the restroom more often could ask to use the restroom. A physician who had previously granted passes for inmates to use the restroom more often had been instructed to stop issuing those passes, so the plaintiff did not have a medical pass to use the restroom more often than every two hours. He asked to use the restroom, but the sergeant had ordered her staff to strictly adhere to the two-hour limit. As a result, the plaintiff's

request was denied, he urinated on himself twice, and he developed a rash from the urine. The court noted that "being able to *request* restroom access is much different than actually being *granted* access." *Id.* The court concluded that "[a] reasonable jury that believed Mr. Hawkins's version of these events may conclude that, having been denied adequate access to the restroom, he was denied the minimal civilized measures of life's necessities." *Id. Hawkins*, however, alleged specific incidents and described his interactions with specific defendants. Richards did not, and this court cannot find that he has stated a conditions of confinement claim against the named defendants merely because they implemented a general policy of keeping cell doors locked during recreation. Therefore, the court stands by its determination that Richards' complaint does not state an Eighth Amendment claim against any individual defendant for subjecting him to unconstitutional conditions of confinement, and the motion seeking reconsideration will be denied.

Richards' Request for a Preliminary Injunction

In Richards' motion seeking a preliminary injunction (ECF 10), he seeks the following injunctive relief:

1) An order that his cell door remain open during recreation;
2) An order directing that both centurion and the IDOC designate him as disabled;
3) An order that Centurion immediately send him out to be evaluated by a gastroenterologist to check on his J-pouch; and
4) An order that Centurion place Richards back on Neurontin to address his pain, because he indicated he has never abused his medication despite Dr. Marthakis' allegation to the contrary.

ECF 10 at 8-9. The court ordered the IDOC Commissioner to respond to the request for preliminary injunction to the extent that it concerns his claims under the ADA and

Rehabilitation Act. The court also ordered the Warden of Indiana State Prison to respond to the request for preliminary injunction to the extent that it concerns his Eighth Amendment claim that his medical care has been constitutionally inadequate. Richards was granted an opportunity to file a reply. Those briefs were received and the court issued an order that resolved Richards' requests for preliminary injunctive relief to the extent that he sought an order that he be placed back on Neurontin[2] and that he be designated as disabled.[3] ECF 41 at 3-4. However, the court determined that Richards' requests that his cell door remain open during recreation and that the court order that he be evaluated by a gastroenterologist specialist required further briefing. ECF 41 at 4-11. The motion is, however, now ripe for adjudication.

---

[2] This court's opinion and order addressed Richards' request for an order directing that he receive Neurontin as follows:

> Richards provides few facts supporting this request. The facts he has provided do not suggest that he has a serious medical need for Neurontin, that medical staff's refusal to provide it amounts to deliberate indifference, or that it has resulted in irreparable harm.

ECF 41 at 3.

[3] This court's opinion and order addressed Richards' request that the IDOC designate him as disabled as follows:

> Further, the request that Centurion and the IDOC designate him as disabled does not appear to arise from the claims in this case. Such a designation does not amount to medical treatment, and, though it may have some relationship to disability accommodations, it does not strike the court as an accommodation in and of itself. Instead, it appears to arise from the agreement entered into by Richards after settling another federal case. Richards does not proceed in this case on claim for enforcement of a settlement contract. *See Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 489 (7th Cir. 2002) ("Because the parties are not diverse, any suit to enforce the settlement agreement in this case would have to be brought in state court even though the settlement was of federal as well as state claims."). Even if he did, it would remain unclear how the lack of disability designation, by itself, amounts to a violation of the ADA/Rehabilitation Act or irreparable harm. Therefore, the court denies the motion for a preliminary injunction to the extent it seeks a disability designation.

ECF 41 at 4.

The legal framework governing preliminary injunctions has already been explained by the court in its screening order:

> "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).
>
> As to the first prong, "the applicant need not show that it definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*. at 763 (quotation marks omitted).
>
> As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "Mandatory preliminary injunctions – those requiring an affirmative act by the defendant – are ordinarily cautiously viewed and sparingly issued [because] review of a preliminary injunction is even more searching when the injunction is mandatory rather than prohibitory in nature." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks omitted).
>
> Additionally,
>
>> [t]he PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.
>
> *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) (quotation marks, brackets, and citations omitted).

ECF 14 at 14-15.

*Restroom Access*

Richards claims that he needs a preliminary injunction that would allow him to leave his cell door open during recreation.

> Title II of the ADA provides that qualified individuals with disabilities may not "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. "Disability" in this context means: "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." *Steffen v. Donahoe*, 680 F.3d 738, 743 (7th Cir. 2012) Prisons and correctional facilities are public entities within the purview of Title II. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Under the Rehabilitation Act, damages are available against a State that accepts federal assistance for prison operations, as all States do. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671–72 (7th Cir. 2012). To state a claim under the Rehabilitation Act, a plaintiff must allege that (1) he is a qualified person (2) with a disability and (3) the defendant denied him access to a program, service, or activity or otherwise discriminated against him because of his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). "Refusing to make reasonable accommodations is tantamount to denying access." *Jaros*, 684 F.3d at 672.

ECF 41 at 4-5.

In response to Richards' request, the warden asserts that the policy of locking cell doors prevents inmates from harming each other and their property. According to the warden, Richards has an opportunity to use the restroom half-way through recreation, and he can also ask correctional staff to open the door to his cell when he needs to use the restroom. Because doors can be opened electronically from the officer station and an officer is generally present in the officers' station, the warden contends that this adequately addresses Richards' needs to access a restroom frequently. Although he has declined to do so, Richards also has the option of wearing an adult diapers to address the possibility that asking an officer to open his cell door will cause him to have an accident.

Richards claims that "on numerous occasions" his requests to access the restroom has resulted in being yelled at or told he must wait. ECF 1 at 7. He also asserts that adult diapers are not a reasonable solution because he is still left smelling of excrement around other inmates. ECF 32 at 4. This court found that the offered accommodations were reasonable in theory.

> What they seem to envision is that Richards utilize the restrooms at the halfway point of recreation and to request that correctional staff unlock his cell door if he needs additional restroom access. In the unlikely event that correctional staff are unable to grant his requests to unlock the door, Richards can rely on adult diapers. That said, the implementation of this reasonable accommodation appears to be disputed. Significantly, Richards represents that his requests to unlock his cell door has been refused, delayed, and discouraged by correctional staff on "numerous" and "frequent" occasions.
>
> The reasonableness of the accommodation seems to turn on its effectiveness in allowing Richards to meaningfully participate in recreation. However, the court is unable to discern with any particularity the frequency of Richards' need to use the restroom during recreation hours and the frequency with which correctional staff refuse or delay Richards' requests to unlock his cell door and result in him soiling himself. If such delays and refusals are only occasional, then the accommodation offered by the defendants are likely reasonable. By contrast, if the delays and refusals frequently result in Richards' soiling himself, then the accommodation is likely not reasonable. Reliance on adult diapers strikes the court as a reasonable back up plan if it is only occasionally required, but too much reliance on adult diapers strikes the court as tantamount to denying Richards access to recreation. It seems fair to say that a prisoner cannot meaningfully participate in recreation in soiled diapers and that an accommodation that contemplates frequent incidents of soiled diapers during the time intended for recreational activity is not a reasonable one.
>
> In sum, the court requires additional information to rule on this portion of the motion for a preliminary injunction. Specifically, the court seeks more information about the frequency of Richards' need to use the restroom during recreation hours and the frequency with which correctional staff refuse or delay Richards' requests to unlock his cell door and result in him soiling himself. It is not enough for Richards to say that there were "numerous" or "several" occurrences, nor is it enough for the defendants to rely on supposition as to how often refusals or delays should theoretically occur. While the court understands that the parties may not have formally recorded every relevant incident, the court is entirely unable to discern the likelihood of relevant incidents on this record.
>
> The defendants should also address whether they might accommodate Richards by leaving his cell door unlocked if he had a

> disability code or a medical recommendation or if he had submitted a reasonable accommodation form pursuant to departmental policy. Similarly, Richards should state whether he has submitted a reasonable accommodation form since submitting his reply brief.

ECF 41 at 6-8.

In response to the court's order, Richards indicates that he uses the restroom up to 25 times a day. He alleges that he has flare ups that "frequently" occur during recreation. He alleges that, when he has a flare up, "there is no holding it." ECF 42 at 5. He concludes as follows:

> So the frequency of the plaintiff's bowel movements, and how many times the plaintiff has been denied or delayed access to his cell to gain access to his toilet can be 1 or 2 times an hour or if I have eaten my lunch or my dinner it can be up to 5 or 6 times during my 3 hrs. of recreation or approx. 15 to 20 times a week but there is always the chance of more if I'm dealing with flare-ups and this is the best estimate I can provide.

ECF 42 at 6. This response highlights how often Richards needs access to a restroom, but it offers no insight into how often either refusal or delay in gaining that access results in him soiling himself. Due to the frequency with which he needs to access a restroom, Richards concludes that leaving the door to his cell open is the only reasonable accommodation. In his reply, Richards again claims that he is "frequently" denied access to the restroom during recreation. ECF 44 at 6. He estimates that this has led to him either urinating or defecating on himself eight to fifteen times between June 7, 2024, and April 27, 2026. ECF 44 at 6. In approximately twenty-one months, Richards estimates that he has either urinated or defecated on himself eight to fifteen times. He has been offered adult diapers for incidents like this and has declined to use them because he is worried about the smell. It is hard to fathom how an accident contained by an adult diaper smells worse than one without. Regardless, the record shows the

accidents have occurred far less than once per month, which is infrequent when viewed in conjunction with the sheer number of times Richards says he needs to use the restroom per day. Based on this record, the court cannot find the possibility of infrequent accidents—which may subject other inmates to an unpleasant smell and embarrass Richards—will cause him to suffer irreparable harm in the absence of a preliminary injunction. *See, e.g., Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (defining "irreparable harm" as harm that "cannot be repaired and for which money compensation is inadequate") (internal quotation marks omitted)). Thus, this request for a preliminary injunction will be denied.

In his response to this court's order, Richards also asks the court to reconsider its conclusion that the offered accommodations are reasonable in theory. ECF 42 at 1. Because this court has denied Richards' request for a preliminary injunction in the form of an order that his cell door remain open based on an inadequate showing of irreparable harm, this is not necessary at this time. An evaluation of the merits of Richards' claims is best addressed at a later stage of the case. Therefore, Richards' motion seeking reconsideration of this determination will be denied.

*Gastroenterology Consultation*

Richards' motion seeking a preliminary injunction also asks for an order for him to be immediately evaluated by a gastroenterologist to check on his J-pouch. The legal

standard for an Eighth Amendment claim of deliberate indifference to medical needs has already been discussed above and will not be repeated here.

In the complaint, Richards alleges in pertinent part:

> Furthermore, Dr. Nancy Marthakis refuses to test this Plaintiff regularly for the highly contagious bacterium C. diff. or send Plaintiff out to a gastrointestinal specialist to undergo a colonoscopy or a pouchoscopy to check on the health of the Plaintiff's J pouch. A J pouch is subjected to serious infections such as pouchitis.
>
> When Plaintiff tries to discuss these concerns with Dr. Marthakis, she becomes upset and tries to belittle the Plaintiff by telling him he's not a doctor, she is, and he doesn't know what he's talking about but in or about 2014 Plaintiff was in fact diagnosed with the infection known as pouchitis.
>
> Dr. Marthakis claims that Plaintiff no longer suffers C. diff. and when Plaintiff asked her how she came to that conclusion, Dr. Marthakis stated, "Do you see that document on my wall? It says doctor. Do you have one, Mr. Richards?," and ended the visit.

ECF 1 at 9.

In the court's earlier order addressing Richards' request for a preliminary injunction, the court noted the following:

> According to Richards, medical professionals refuse to discuss his concerns and to properly document his concerns in his medical records. ECF 7 at 6. He also represents that his medical requests for J pouch concerns go unanswered. *Id.* at 7. Nevertheless, the defendants rely on the absence of any medical requests or medical records in which Richards has expressed concerns about his J pouch, and they do not address Richards' struggles with persuading medical staff to entertain his concerns. While Richards' showing falls short of demonstrating that he is constitutionally entitled to a gastroenterology consultation, it does tend to suggest that medical staff are acting with deliberate indifference towards Richards' medical concerns. The alleged references by Dr. Marthakis to the educational disparity between Richards and herself do not reflect a decision based on professional medical judgment. Nor is it clear why a medical professional would refuse to respond to or to document in medical records a patient's good faith medical concerns.
>
> At base, the court would prefer to know the medical reasons for refusing Richards' requests, if any, before ruling on this portion of the motion for a preliminary injunction. As a result, the court will grant the defendants an opportunity to provide a medical explanation for refusing Richards' requests for specific medical treatment, whether through additional medical records, a sworn affidavit from a medical professional, or otherwise.

ECF 41 at 9-10.

The defendants' response (ECF 43) to the court's order falls short of this court's expectations.[4] Defendants indicate they could not obtain an affidavit from Dr. Marthakis before the deadline to respond,[5] and no additional medical documentation was provided. While the defendants' response leaves much to be desired, it is ultimately the plaintiff's burden to make a clear showing that he is entitled to the extraordinary remedy of a preliminary injunction. *See Mazurek*, 520 U.S. at 972; *Winter*, 555 U.S. at 20.

Richards has not made a strong showing that he will win on his claim against the warden for permanent injunctive relief. *Ill. Republican Party*, 973 F.3d at 762-763. A claim for permanent injunctive relief is focused on the care Richards is getting now and whether court intervention is necessary to ensure constitutionally adequate care. It is not focused on isolated incidents in the past. Richards makes claims that he has sought care and his requests are not responded to, but the record also shows that Richards receives a good deal of medical care for his various chronic conditions. *See* ECF 25; ECF 26.

The record before this court shows that Richards is seen by medical staff frequently for his various medical problems. ECF 25-5 (showing nine nurse visits between February 2025 and August 2025). On June 13, 2024, Richards submitted a

---

[4] It includes several factual assertions that are not accompanied by any evidence whatsoever. These range from repeating what staff told the defendants without producing any sworn statements or other documents to a claim that Richards was tested for C. Diff when Richards reported increased loose stooling and the results were negative. *See* ECF 43 at 4, 6.

[5] Dr. Marthakis has provided affidavits in response to numerous orders directing the warden to respond to requests for preliminary injunctive relief. That she is represented by separate counsel has not proven to be an obstacle, and if additional time was needed, it could have been requested.

health care request that asked for a pass requiring that his cell door be left open during recreation. ECF 25-1 at ¶ 18. Medical staff responded on June 20, 2024, by offering him adult diapers to address his concerns. *Id.* at ¶ 19. He requested that all of his medications be refilled in July and the medical staff promptly responded by ordering the necessary medication. *Id.* at ¶ 20. On July 30, 2024, Dr. Marthakis saw Richards for a chronic care visit. *Id.* at ¶ 21; ECF 25-6. Richards complained that the medication he takes to control his chronic diarrhea was not working adequately. Richards and Dr. Marthakis discussed increasing the dose, and she noted that the increased dose would require a formular exception. He also asked that he be granted a special pass to leave his cell door open. Dr. Marthakis explained that she could not authorize this but she would inquire. She offered him adult diapers, which he refused. It is unclear from the record whether that exception was granted, but Richards is not complaining about the dose of Loperamide he is receiving. He wants two very specific things: testing for C. diff and a consultation with a gastroenterologist.

Richards is not entitled to demand specific medical care. "[T]he Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). "Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Id.* Inmates are "not entitled to demand specific care [nor] entitled to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Richards has not shown that either of his very specific requests are medically necessary. The court respectfully acknowledges that Richards is not a doctor; he is not qualified to

determine what tests are necessary or when his condition requires the attention of a specialist. Richards' chronic diarrhea is being treated. Richards has not demonstrated that the care he is receiving now falls below that which the Constitution requires. Not every medical problem can be fixed. Richards has also not demonstrated that – if Richards submits a health care request asking to see a medical provider or if he raises his concerns at his next chronic care visit – he cannot obtain constitutionally adequate care for his condition.

Richards likewise has not made a clear showing that irreparable harm will result in the absence of an injunction. *Winter*, 555 U.S. at 22. Richards has suffered from chronic diarrhea for years and, given his medical history, this seems likely to continue. The Seventh Circuit in *Snipes* noted the following regarding pain:

> It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain. To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd. It would also be absurd to say (as Snipes appears to) that the Constitution requires prison doctors to administer the least painful treatment. That may be preferable, but the Constitution is not a medical code that mandates specific medical treatment.

*Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Richards clearly suffers from very serious medical conditions, but the Constitution does not mandate that he be restored to good health – something that seems unlikely given Richards' condition. In short, Richards has not made the showing necessary to convince the court that a preliminary injunction is needed to prevent irreparable harm. Therefore, his motion seeking a preliminary injunction in the form of an order that he receive additional testing or a consultation with a specialist will be denied.

For these reasons, the court:

(1) DENIES Danny L. Richards' motion to reconsider the court's screening order (ECF 16-1);

(2) DENIES Danny L. Richards' motion seeking reconsideration of a portion of this court's March 13, 2026, order (ECF 42); and

(3) DENIES Danny L. Richards' motion seeking a preliminary injunction (ECF 10).

SO ORDERED on September 4, 2026

/s/Gretchen S. Lund
JUDGE
UNITED STATES DISTRICT COURT